## Case No. 11,106.

### PHILLIPS v. The THOMAS SCATTERGOOD.

[Gilp. 1.] [1]

District Court, E. D. Pennsylvania. Dec. 5, 1828.

SEAMEN — MASTER'S WAGES — WHEN CONTRACT TERMINATED—MARITIME LIENS—BY STATE LAW—PREFERENCES.

1. The master's wages are a personal charge on the owner, and give no claim on the vessel.
   [Cited in The Larch, Case No. 8,085; Packard v. The Louisa, Id. 10,652.]

2. A contract for wages on a voyage is fulfilled and terminated on the discharge of the cargo at the last port of delivery.

3. Payment and receipt, on the final discharge of the cargo, is the usual and sufficient evidence of the termination of a seaman's contract for wages.

4. A seaman, whose wages have been paid up to the termination of a voyage, but who afterwards remains on board of the vessel, moored at the wharf, has no claim for services which a court of admiralty will enforce.
   [Cited in Scott v. The Morning Glory. Case No. 12,542; Packard v. The Louisa, Id. 10,-652. Cited in brief in The May Queen, Id. 9,360. Cited in M'Dermott v. The S. G. Owens, Id. 8,748; The John T. Moore, Id. 7,430; Roberts v. The Windemere, 2 Fed. 725; The Trenton, 4 Fed. 662; The Erinagh, 7 Fed. 235; The Murphy Tugs, 28 Fed. 432.]

5. Workmen and materialmen, having a lien on a vessel, under the provisions of a state law, may enforce it by a suit in rem in the admiralty.
   [Cited in The Richard Busteed, Case No. 11,-764.]

---

[1] [Reported by Henry D. Gilpin, Esq.]

6. Workmen and materialmen, having a lien on a vessel which has been taken in execution and sold under a judgment in favour of the United States, are entitled to payment out of the fund in preference to the United States.

[Cited in Re Hambright, Case No. 5,973.]

On the 13th May, 1828, suit was brought by the United States of America against Henry Toland and John C. Smith, on a custom house bond for the payment of duties. On the 19th May, judgment was rendered for the United States, and on the 30th May, a writ of fieri facias issued. On the 15th November following, the marshal made return, "that in pursuance of the said writ he had levied upon and taken in execution a ship called 'The Thomas Scattergood,' and, after due and timely notice, sold the same for the sum of four thousand eight hundred dollars, which sum he had then in court." On the same day, John Phillips, lately master of the said vessel; A. Chardon, Robert Gardner, and William Egan, who alleged that they had done work on board; James S. Collins, lately chief mate; Michael and J. Brown, who had done riggers' work; and William Ker, who had supplied varnish for the vessel, severally filed their petitions and accounts, praying that the sums of money due to them respectively, might be paid out of the funds brought into court by the marshal, as the proceeds of the sale of the said vessel, under the execution just returned by him.

H. Hubbell, for petitioners.

Dist. Atty. Ingersoll, for the United States.

HOPKINSON, District Judge. The ship Thomas Scattergood, on her return to the port of Philadelphia, from a voyage to Canton, was taken in execution under a writ of fieri facias for a debt due to the United States. The ship arrived at Philadelphia on or about the 23d April, 1828, was seized by the marshal on the 30th May, and in due course of law, sold. The proceeds of the sale are now in the hands of the marshal, subject to the order of the court. The petitioners, above named, have respectively filed their claims, and ask for payment from this fund in preference to the United States; and their right to this payment is now to be decided. The first is an account presented by Captain J. Phillips for his wages, as master of the ship, amounting to five hundred and seven dollars. No evidence has been offered in proof of this account; but as it is entirely clear that the master's wages are a personal charge on the owner, and give no claim upon the ship, it may be dismissed without further remark. The petitioners, A. Chardon, Robert Gardner, and William Egan, have put into the possession of the court nothing by which the nature of their several claims can be ascertained; they exhibit only orders from Captain Phillips on the owners of the ship, for their respective debts "for work on board the ship;" but as to what the work was, and when or where it was done, no information is given, either by the petition, the account filed, the order, or any other evidence or document. No opinion can, therefore, be given by the court upon these claims; except that, in their present defective state, they must be dismissed.

The claim which has been most strenuously urged, as new and undecided, and in relation to which the most difficulty exists, is that of James S. Collins. It consists of a demand of wages from the 24th April, 1828, to the 14th June, of the same year, amounting to fifty-nine dollars and thirty-three cents, and a further charge of thirty dollars for boarding during the same period. In the petition filed, Collins alleges that he was first officer of the ship Thomas Scattergood, on her late voyage from Philadelphia to Canton in China, and back again; that he has only received his wages, as such first officer, to the 23d April, 1828; and that there is still due to him, he never having been discharged from the said situation until the 14th June following, the sum of fifty-nine dollars and thirty-three cents, as wages, and thirty dollars laid out for his own maintenance. In the affidavit of John Collins, annexed to the petition, it is stated, that the petitioner remained in charge of the ship after the discharge of her cargo; that is, from the 24th April, 1828, until the 14th June following: and that he had the entire care of the ship during that period, and maintained himself. It appears by the same affidavit that there was a watchman on board the ship, but who placed him there, or by whom he was paid, does not appear. The petitioner does not allege that he either employed or placed this watchman, and makes no charge for his services. It seems, therefore, not to be absolutely certain that the vessel was in the care or charge of the petitioner; at least not entirely so, another person being there as a watchman (and one would seem to be sufficient) under some authority, and paid by somebody. How are we assured that the care of the vessel, whatever it was, assumed by the petitioner, was not a mere voluntary service, unrequired by any body interested in her? Neither his petition, nor any of his proofs, alleges that he was retained by the owners, or by any body, to take care of the ship; but merely that he had not been discharged from his situation of first officer. James Morrel, the second witness of the petitioner, says that he was paid his wages, upon the return of the ship to port, until her discharge on the 23d April; but whether he was afterwards retained or discharged by the owners, the witness does not know. We see that the importance of proving how, and by whom, the petitioner was engaged in this service, was not overlooked, but the attempt failed. If it were necessary to scrutinise this claim closely, we could not fail to remark, that, for a portion of the time for which the petitioner claims to have had the entire care of the ship, she was actually in the custody of the marshal under his execution.

The case of the petitioner appears to be this. He was the first officer of the ship Thomas Scattergood on a voyage from Philadelphia to Canton, and back again. The ship returned to the port of Philadelphia, her cargo was discharged, and the petitioner was fully paid his wages to the time of her discharge. He afterwards remained in the ship, then lying at the wharf in Philadelphia, for the purpose, as he alleges, of taking care of her, and he now claims wages for this service as a continuation of his duties as the first officer of the ship. If it was part of his duty under that contract, and in performance of it, there would be no difficulty in saying that he has the same remedies for the recovery of wages for this service, as for that performed in the course of the voyage; and consequently that the body of the ship, or the proceeds of her sale, would be answerable for the debt. But it seems to be very clear that this is not the case. What was the original contract? For labour and service on a voyage from Philadelphia to Canton and back to Philadelphia. On the return of the ship to Philadelphia, the voyage was completed, and the contract was certainly fulfilled and terminated on the discharge of the cargo. The owners of the ship, the other party to the contract, had no further claim on the petitioner for any duty or service under the contract; and, of course, he had no further claim upon them or their ship. The rights of the parties, in this respect, must be mutual and reciprocal; it cannot be, that the contract was ended and extinct as to one of the parties, and continued in full force and life as to the other. By our act of congress, every seaman has a right to sue for his wages as soon as the voyage is ended and the cargo discharged at the last port of delivery: and this right could be given only on the ground that when the voyage is ended, and the cargo discharged, the contract is fulfilled. In this case the voyage was ended: the petitioner received his wages to the time of the discharge of the cargo, and his relation with the ship as a seaman on board of her, under his original contract, ceased. No formal act of discharge was required; the payment and receipt of the wages, is the usual and sufficient evidence of the termination of this relation. If the petitioner afterwards remained in the ship to watch her, or for any other purpose, it was a new service, and under a new contract, express or implied, or a mere volunteer act without any contract. No express contract is either proved or alleged; and the petitioner has his strongest case conceded when it is agreed that the service raises a good consideration for a debt, and a contract may be implied or presumed from it.

This brings the case to the question, whether this is such a contract as may be enforced in the admiralty, and gives the claimant a lien on the ship for payment. It is a contract neither made at sea, nor for a service to be performed at sea; both were in the port of Philadelphia, within the body of the county of Philadelphia. The ship was safely moored at the wharf, she had returned to the possession of the owners, the service had no agency in bringing her in, she had ceased to earn freight. The contract between the owners and the seamen had expired; the relation and rights created by that contract were dissolved. It is true that the same parties might make a new contract, but they could not extend the old one beyond its legal limits, nor give to the new one a character and privileges which the law denies to it. The place and subject matter of a contract decide its maritime character, and not the will of the parties. Is there an instance, in which a contract, made on land, for a service to be rendered on land, having no connection with any voyage performed or to be performed, has been deemed, by the general admiralty law, a case of admiralty jurisdiction, giving a lien on the ship? The meritorious service of the petitioner, if such it was, and the hardship of the case, have been strongly pressed in his behalf; but they must not be permitted to unsettle established principles, or to remove the land-marks of judicial jurisdiction. He should have been more careful to know by whom he was to be compensated before he gave his labour. Even now his remedy remains against his employer, perhaps against those to whom the service was rendered. Our inquiry is, whether the ship is answerable for it. The case of Ross v. Walker, 2 Wils. 264, is directly in point. A pilot was sent for to Gravesend to come on board the ship Oxford, being in sea reach, who accordingly went on board of her there, and piloted her from thence to her moorings at Deptford. For his wages due him on that account he instituted a suit in the court of admiralty. A prohibition was moved for, on the suggestion that both the contract and the work done were within the body of the county. The court say, "We are much inclined to favour the pilot, (who is a most necessary mariner) if we could do it without breaking through the rules of law, because it would be for the benefit of trade, and save great expense to these poor men; but there is no instance to be found where the contract was at land, and to do work on board within the body of some county, that the common law courts have ever permitted the admiralty to have jurisdiction." That the petitioner had formerly been the mate of this ship, on a voyage that was ended, can make no difference in the case, which stands precisely as it would have done, if a third person had been engaged in this service, or if he had for the first time come on board the vessel. In the case of North v. The Eagle [Case No. 10,309] it is declared that "when contracts are made between the owner of a vessel, with the carpenters and others, to perform a service on land, or within the body of a county, the admiralty

has no jurisdiction." So in the case of Pritchard v. The Lady Horatia [Id. 11,438]. The counsel for the petitioner has relied on a supposed analogy of his claim to that of a wharfinger, and on the principles of the case of Woolf v. The Oder [Id. 18,027]. As to wharfage, it is said by the court, in the case of Gardner v. The New Jersey [Id. 5,233], that "wharfage has been allowed out of proceeds, as the wharfinger might detain the ship until payment." This reason does not apply to the petitioner. In the case of Woolf v. The Oder [supra] the voyage was broken up, without any fault of the seamen, by a seizure for the debt of the owner, and, so far, by his default; and the seamen, by the exercise of a reasonable and just discretion in the court, were allowed their wages to the time of seizure, with an additional month's pay for their disappointment as well as to enable them to return to their homes, or obtain other employment. There is nothing in the circumstances or principles of this case, to assimilate it to that before the court. The claim of James S. Collins is therefore dismissed, not without the reluctance which attends the refusal of a demand probably meritorious and just, but which seeks satisfaction in the wrong place.

The claim of Michael and J. Brown, for riggers' work done to the ship, and of William Ker, for varnish used on her, stand on different ground from those already disposed of, and require a separate consideration. Judge Winchester, after a learned argument in the case of Stevens v. The Sandwich [Case No. 13,409], comes to the conclusion that "a ship carpenter, by the maritime law has a lien on the ship, for repairs in port." Judge Peters, in the case of Gardner v. The New Jersey [supra], says that as the laws of Pennsylvania provide for shipwrights and materialmen, he has "generally referred the parties, exhibiting such claims, to the state jurisdiction, wishing to avoid all collisions and conflicts in such cases." Judge Bee, in the case of North v. The Brig Eagle [supra], already quoted, seems to limit the admiralty jurisdiction to supplies, &c. furnished to a foreign vessel in a neutral port. In that of Pritchard v. The Lady Horatia [supra], which was a suit instituted against the vessel for work done, and materials found by shipwrights, the vessel being foreign, and her owners residing abroad, though there was a consignee here, who had funds of the owners arising from the sale of the cargo; Judge Bee decided that "this being a transaction on land, the vessel not being on a voyage, but unladen and the cargo sold; and the owners being represented on the spot, by their consignee, who has in his hands ample funds arising from the sale of the cargo; no such invincible necessity exists, as the laws of all commercial countries seem to require, in order to vest jurisdiction in the admiralty." In the opinion given by Judge Story in the case of The Jerusalem

[Case No. 7,294], decided in 1815, he has bestowed his accustomed learning and powers of investigation upon this subject. He adverts to the distinction between the question of jurisdiction and that of lien. He has no doubt of the jurisdiction of the admiralty over suits in favour of material men; the subject matter making it a maritime contract, and over all such the admiralty rightfully possessing jurisdiction. On the question for repairs to a ship, he holds that in cases of foreign ships, or of ships in foreign ports, a lien is created by the maritime law; but, he adds "whether, in a case of a domestic ship, material men have a lien for supplies and repairs furnished at the port where the owner resides, I give no opinion; there are great authorities on both sides of the question." In the case of The Aurora, 1 Wheat. [14 U. S.] 96, decided in 1816, the same judge, delivering the judgment of the supreme court, says "it is undoubtedly true, that material men, and others, who furnish supplies to a foreign ship, have a lien on the ship, and may proceed in the admiralty to enforce that right;" and the general tenor of his opinion seems to limit this right to foreign ships, although not so expressly decided. We are however relieved from all embarrassment, in the case before us, by the decision of the supreme court in the case of The General Smith, 4 Wheat. [17 U. S.] 438, in which it is said that "where repairs have been made, or necessaries have been furnished to a foreign ship, or to a ship in a port of the state to which she does not belong, the general maritime law, following the civil law, gives the party a lien on the ship itself for his security; and he may well maintain a suit in rem in the admiralty to enforce his right. But in respect to repairs and necessaries, in the port or state to which the ship belongs, the case is governed altogether by the municipal law of that state; and no lien is implied unless it is recognised by that law." In a note to the same case it is said that "this lien, existing by the local law, may be enforced by a suit in rem in the admiralty."

By an act of the legislature of Pennsylvania, passed on the 27th March, 1784 [2 Smith, Laws, 95], "Ships and vessels of all kinds, built, repaired and fitted within this state, are declared to be liable and chargeable for all debts contracted by the masters or owners thereof, for or by reason of any work done or materials found or provided, for, upon, or concerning the building, repairing, fitting, furnishing and equipping such ship, in preference to any, and before any other debts due and owing from the owners thereof."

Upon the provisions therefore of this municipal law, and the principles laid down by the supreme court, in the case cited, it is ordered that, out of the funds in the hands of the marshal proceeding from the sale of the ship Thomas Scattergood, there be paid

to Michael and J. Brown fifty-three dollars and forty-four cents, and to William Ker, ten dollars and seventy-five cents.